A. Clifford Edwards, State Bar # 418
Triel D. Culver, State Bar # 3929
EDWARDS, FRICKLE & CULVER
1648 Poly Drive, Suite 206
Billings, MT 59102
Telephone: (406) 256-8155
Telefax: (406) 256-8159
Email: jenny@edwardslawfirm.org
      triel@edwardslawfirm.org

Jon E. Doak, State Bar #2542
DOAK & ASSOCIATES, P.C.
100 North 27th Street, Suite 200
P. O. Box 1875
Billings, Montana 59103
Telephone: (406) 896-8904
Telefax: (406) 896-8937
Email: doaklaw@wtp.net

Attorneys for Plaintiff
Kelly Supply, LLC



FILED

JAN 28 2014

Clerk, U.S. District Court
District Of Montana
Billings

## MONTANA SEVENTH JUDICIAL DISTRICT COURT
## RICHLAND COUNTY

| | |
|---|---|
| KELLY SUPPLY, LLC a Montana limited liability company,<br><br>                Plaintiff,<br><br>      vs.<br><br>ECONOMY POLYMERS AND CHEMICALS, a division of ECONOMY MUD PRODUCTS COMPANY, a Texas corporation, SIDNEY INVESTMENTS, INC., a Delaware corporation, and TRAVIS CLARK, a Montana resident,<br><br>                Defendants. | Cause No. **DV-13-126**<br><br>Judge  **KATHERINE M. BIDEGARAY**<br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL**<br><br>CV-14-03-BLG-SPW-CSO |

COMES NOW the Plaintiff, Kelly Supply, LLC, by and through its undersigned counsel,

1

and for its complaint against the Defendants Economy Polymers and Chemicals, Economy Mud

Products Co., Sidney Investments, Inc., and Travis Clark, states and alleges as follows:

### JURISDICTION AND VENUE

1.     Kelly Supply, LLC ("Kelly Supply") is a member-managed Montana limited liability

company, with its principal place of business at 35460 Highway 23, Sidney, Montana 59270.

2.     The member managers of Kelly Supply are John and Laura Kelly, husband and wife, who

reside in Sidney, Richland County, Montana.

3.     Upon information and belief, Defendant Economy Polymers and Chemicals is a division

of Defendant Economy Mud Products Company, a Texas corporation (hereinafter collectively

"Economy"), with its principal office located at 435 East Anderson Road, Houston, Texas 77047.

Defendant Economy Mud Products Co.'s registered agent in Montana is Walter White, 34775

County Road 126, Sidney, Montana 59270.

4.     Upon information and belief, since prior to May, 2010, Lawrence E. Walton is and has

been the President and Chief Executive Officer of Economy; Walter M. White is and has been its

Treasurer and Chief Sales Officer; and Matthew White, son of Walter White, is and has been a

corporate officer and director of Economy.

5.     Upon information and belief, Economy is one of the largest importers in North America

of guar, an organic polymer produced almost exclusively in India and Pakistan, which is an

essential component of solutions used in the hydraulic fracturing ("fracking") of oil and gas wells

in the United States, and Economy is and was prior to 2010 one of the largest sellers of

guar-based solutions to the American oil and gas industry for such purposes.

6.     Upon information and belief, Economy is and was prior to 2013 a supplier of other dry

2

and liquid chemical additives for use by the oil and gas industry in connection with the drilling

and completion of oil and gas wells; and the owner and holder of a proprietary process called

Economy Liquid Inventory Monitoring System or "ELIMS" for electronically inventorying and

monitoring additives, like its guar-based solutions and other chemical additives, that have been

injected or otherwise introduced into oil and gas wells.

7.      Upon information and belief, Defendant Sidney Investments, Inc. ("Sidney Investments"),

is a Delaware corporation, qualified to do business in Montana, the registered office of which in

Montana is located at 208 North Broadway, Suite 313, Billings, Montana 59101, and the

principal place of business of which is located in Richland County, Montana.

8.      Upon information and belief, Walter M. White is Defendant Sidney Investments'

President, Director, Treasurer and Secretary and registered agent in Montana.

9.      Upon information and belief, Defendant Travis Clark is a Montana resident, residing in

Sidney, Richland County, Montana.

10.     Jurisdiction and venue of this action are proper in the District Court in Richland County,

Montana as the contract at issue between Kelly Supply and Economy was negotiated via email,

in person, and via telephone in Richland County, Montana; the contract contemplated

performance in Montana; most of the acts and omissions of Defendants of which Kelly Supply

complains herein were committed in Richland County, Montana; and Kelly Supply incurred its

resulting injury and damages in Richland County, Montana.

### *FACTUAL BACKGROUND*

11.     Prior to 2007, John Kelly, President and one of the member/managers of Kelly Supply,

was the Montana regional sales manager of Austin Powder South Central LLC ("Austin

Powder"), an Ohio-based supplier of explosives and other materials used in the mining and oil and gas industries in Montana, North Dakota and other western states.

12.     John Kelly's father had been associated with Austin Powder for many years before John was employed there, and Economy President Lawrence Walton was a longtime friend and trusted business associate of the elder Kelly.

13.     Through his employment with Austin Powder, John Kelly formed substantial business relationships with well service and drilling companies engaged in oil and gas drilling and development activities in the "Bakken area" of eastern Montana and western North Dakota.

14.     In 2007, as oil and gas development accelerated in the Bakken area, John and Laura Kelly formed Kelly Supply for the purpose of supplying bentonite, sand and other substances used in the drilling and development of oil and gas wells to drilling companies and well service companies.

15.     As part of their formation of Kelly Supply, John and Laura Kelly leased to Kelly Supply for its business operations a tract of real property (hereinafter "the Property") on the outskirts of Sidney in Richland County , the address of which is 35460 Highway 23, Sidney, MT 59270, and the legal description of which is:

> A tract of approximately 14.74 acres located in the NE1/4 of Section 18, Township 22 North, Range 60 East, P.M.M., included in Certificates of Survey Nos. 27-92 and 27-129, on file in the office of the Clerk and Recorder of Richland County.

16.     There was on the Property in 2007 a metal sided warehouse, encompassing approximately 22,500 square feet, with two bay loading dock, concrete apron, and adjacent approximately 25 x 50 foot office, surrounded by a gravel parking lot and truck loading area.

17.     On about May 1, 2010, Lawrence Walton and Matthew White, acting on behalf of

4

Economy, contacted John Kelly by telephone to discuss Economy's desire to secure warehouse and mixing facilities in the Sidney, Montana area for greater convenience in supplying Economy's guar-based solutions and chemical additives to drilling and well service companies in the Bakken area.

18.     Upon information and belief, in May, 2010, Economy was mixing its guar-based solutions and other additives in Rock Springs, Wyoming and the Houston, Texas area and transporting them in liquid form, at considerable time and expense, by tanker truck to Montana and North Dakota.

19.     Between about May 1 and May 14, 2010, Kelly Supply (by John Kelly) and Economy (by Lawrence Walton and Matthew White), negotiated the terms and conditions of an agreement with a three (3) year base term whereunder Economy would lease approximately 20,000 square feet of Kelly's warehouse space with loading dock and apron for $12,000 per month; and employ Kelly Supply to unload Economy's products into the warehouse, mix the components supplied by Economy into liquid slurries and compounds at the price of $.10 per gallon, and load the slurries and compounds into trucks for delivery to Economy customers who were well service companies in the Bakken area; with Economy to pay for electric power in the warehouse and provide a forklift and mixing and loading equipment for Kelly Supply's use.

20.     The general terms and conditions of the warehouse lease and mixing agreement were memorialized in a Memorandum of Agreement emailed by Lawrence Walton of Economy to John Kelly dated May 14, 2010, a true copy of which is attached as Exhibit "A".

21.     Between about May 15 and August 1, 2010, Kelly Supply was receiving and unloading truckloads of bagged dry products from Economy and placing the products in the Kelly Supply

warehouse on the Property.

22.     Beginning about May 15, 2010, Kelly Supply began installation of several 10,000 gallon

liquids tanks supplied by Economy adjacent to the warehouse on the Property for storage of

liquid components used in production of slurries and compounds for Economy.

23.     Beginning about July 1, 2010, Kelly Supply began to receive by truck and unload into an

area of Kelly Supply's warehouse components of industrial mixers shipped by or for Economy

for Kelly Supply's use in mixing the slurries and compounds for Economy, pumps for

transferring liquids between tanks, mixers and trucks, gauges for the tanks and mixers, an auger

for loading dry products into the mixers, and a forklift.

24.     Beginning about July 27, 2010, Kelly Supply began receiving from Economy its formulas

for mixing the gels, slurries and other additives required by Economy's oil field customers,

which included Schlumberger, Halliburton Industries, Baker Hughes, Calfrac, and Pumpco, for

their Bakken area operations.

25.     On about August 1, 2010, Kelly Supply received via email from Economy a document

titled "Service Agreement", superseding the May, 2011 Memorandum of Agreement and further

memorializing the terms and conditions of a three-year base term contract between Economy and

Kelly Supply, effective as of August 1, 2010, for leasing of 20,000 square feet of Kelly Supply's

warehouse space for $12,000.00 per month, compensation (at $.25 per gallon) for Kelly Supply's

mixing of Economy's products on the Property, and $150.00 per truckload for unloading

Economy's raw products and $150.00 per truckload for loading mixed products. A true and

correct copy of the Service Agreement is attached as Exhibit "B".

26.     The Service Agreement integrated the terms and conditions of the contract between

6

Economy and Kelly Supply, effective as of August 1, 2010, for a three year base term (subject to automatic renewal/extension year to year unless terminated on 90 days' prior written notice), for the leasing by Economy of 20,000 square feet of warehouse space on the Property, use of the loading dock and concrete apron, Kelly Supply's services in loading and unloading trucks, and Kelly Supply's services in mixing liquid slurries and compounds pursuant to formulas supplied by Economy, for products to be delivered to Economy's Bakken area oil field customers.

27.     In the Fall of 2010, a transformer unit was installed on the Property by the local electric cooperative for the mixing equipment; Economy brought in its own Texas-based electricians to pull wire from the transformer to Kelly Supply's warehouse building on the Property; and the electricians installed conduit and pulled wires–per Economy's instructions--around the perimeter of the warehouse space Economy was leasing on the Property to supply electric power for operating the additional mixers, pumps, tanks, loading and unloading equipment Economy had supplied.

28.     About September 1, 2010, Bobby Hyatt, an Economy technician and field agent, arrived on the Property to supervise and direct the installation and set-up of the mixers, pumps, gauges, tanks and other equipment necessary for mixing chemical additives on the Property.

29.     In September, 2010, Kelly Supply was mixing guar-based slurries, per Economy's formulas and directions, and loading them and other Economy products onto third-party tank trucks operated by Talco Trucking Inc. ("Talco"), a Rock Springs, Wyoming company, for delivery to Economy customers pursuant to orders submitted by the customers directly to Economy and retransmitted to Kelly Supply.

30.     In September, 2010, Bobby Hyatt informed Kelly Supply that Talco would be pulling its

trucks and ceasing to haul for Economy because Talco claimed it could not make any money; and asked if Kelly Supply would take over all of Economy's delivery trucking at the then current rate Economy was paying Talco of $90.00 per hour demurrage and $150.00 per hour drive time.

31.     Kelly Supply accepted Economy's trucking proposal, modifying and expanding the Economy/Kelly Supply Service Agreement to include delivery trucking to Economy's Bakken area customers; and Kelly Supply added numerous trucks and trailers to its rolling stock fleet in reliance on the expanded Service Agreement.

32.     During the Fall of 2010, John Kelly and Economy's Bobby Hyatt negotiated the installation of a truck scale on the Property, with Economy agreeing to furnish the scale; Kelly Supply to construct at its expense the scale house and a connecting office; Kelly Supply to pay for installation of utility services and monthly utility billing; Kelly Supply to waive rent on the scale site; and the scale to be left should Economy cease operations on the Property.

33.     In reliance on Economy's commitment to the scale installation terms, Kelly Supply constructed an 80' x 20'4" scale house, with 17'41/2" side walls, and 12'3"x12'3" connecting office; Kelly Supply provided utility service; and the scale was delivered and installed.

34.     Through the Fall of 2010, Economy repeatedly failed to timely supply Kelly Supply with various dry and liquid elements for slurries and additives to fill customer orders taken by Economy--causing Kelly Supply to have to scramble its labor and equipment at its additional expense to meet customer orders in the field.

35.     Beginning in the Fall of 2010, Economy failed, despite repeated requests from Kelly Supply, to provide in working condition various components of the equipment Economy had committed to provide for loading, unloading and mixing by Kelly Supply on the Property,

8

causing Kelly Supply substantial expense for repairs and replacements essential to fulfill its obligations under the Service Agreement.

36.     In connection with and in reliance on the Service Agreement, Kelly Supply began in late 2010 constructing an additional 10,000 square feet (100' X 100') of warehouse space on the Property—attached to the existing warehouse--for chemical mixing and storage, and installed concrete pads adjacent to the new warehouse space for additional tanks and equipment.

37.     In April, 2011, Kelly Supply reconstructed (at its expense) the warehouse loading dock on the Property that had been significantly damaged by Economy's freight carriers.

38.     In the Spring of 2011, John Kelly was contacted by a third party regarding potential purchase of the Property and Kelly Supply's assets for $10,000,000.00.

39.     On about August 5, 2011, John Kelly met with Economy's Matthew White on the Property; reiterated to Mr. White Kelly Supply's continuing frustration with Economy's lack of cooperation and uneven performance under the Service Agreement; and advised White they were considering sale of the Property and Kelly Supply assets for $10,000,000.00.

40.     During the meeting, White advised John Kelly that Economy would fix the problems with Economy's performance and lack of cooperation; advised Kelly that Economy was planning to invest about $500,000 into the loading, unloading and mixing operations Kelly Supply was performing for Economy on the Property; and represented that Economy had no intention of pulling out of such operations.

41.     Shortly after the August, 2011 meeting, Matthew White advised Kelly that Economy had hired Travis Clark, formerly an employee of Talco Trucking in Wyoming, specifically to work with Kelly Supply on Economy's operations in Montana.

9

42.     Travis Clark moved to Sidney, Richland County, Montana in the Fall of 2011, occupying a mobile home rented by Economy from John and Laura Kelly, and began serving as Economy's Montana representative in its dealings with Kelly Supply.

43.     In the Fall of 2011, Schlumberger (one of Economy's customers) asked Kelly Supply to put on additional trucks and trailers to ramp up its delivery capability to Schlumberger's work sites in the Bakken area; Kelly advised Travis Clark of the request; and Clark reconfirmed to John Kelly that Economy wanted Kelly Supply to continue to be Economy's exclusive guar-based solutions delivery company to Economy's customers in the area.

44.     In reliance on Clark's reconfirmation of Kelly Supply's continuing trucking role under the Service Agreement, as amended, Kelly Supply purchased additional trucks and trailers, and hired additional drivers.

45.     In the Fall of 2011, Kelly Supply and Economy recognized the need to construct on the Property new laboratory space for testing the solutions and other additive compounds being mixed by Kelly Supply on the Property.

46.     In the Fall of 2011, Travis Clark requested that Kelly Supply provide office space for he and other Economy personnel on the Property, promising that Economy would pay fair compensation for their use and occupancy of the office space.

47.     In reliance on Clark's request and promise, Kelly Supply (at its expense) finished in 2011 a material expansion of the existing office space on the Property, which consisted of adding on 1250 square feet in front of the existing offices and 1160 square feet out the back, including an approximately 145 square foot lab space and approximately 148 square foot office space for Economy's use.

48.     Beginning about December 1, 2011, Clark and other Economy personnel moved into and began using the newly constructed lab and office space on the Property.

49.     During the Fall of 2011, Economy's contractors installed conduit, wiring and electrical service components to the new 10,000 square foot warehouse area Kelly Supply had constructed on the Property; placed and installed two additional chemical mixers in that space; and installed, plumbed and interconnected to electrical service several new product and oil tanks supplied by Economy for use on the Property.

50.     On about January 20, 2012, Travis Clark emailed to Kelly Supply a three year extension to the Service Agreement, signed by Economy's President Lawrence Walton; which Laura Kelly thereafter signed on behalf of Kelly Supply.   A true and correct copy of the extension is attached as Exhibit "C".

51.     Under the extension, the Economy/Kelly Supply Service Agreement was extended to August 1, 2016, with year-to-year renewal unless terminated on 90 days' notice.

52.     During a conversation with John Kelly on February 2, 2012, Travis Clark represented to John Kelly that he would give Kelly Supply a detailed, "worry free" agreement regarding what Economy expected so there would be no more misunderstandings; that he (Clark) was now in charge of Economy's Montana operations; that Kelly Supply was and would be Economy's exclusive mixing facility to supply Economy's guar-based solutions to the Bakken area; and that Economy would pay fair compensation for use of the new office and lab space.

53.     In reliance on the 2012 extension of the Service Agreement with Economy and Clark's representations, Kellys discontinued their discussions with third parties regarding sale of the Property and the Kelly Supply assets.

11

54.     In March, 2012, after Laura Kelly had asked Clark to stop interfering with Kelly Supply's employees by offering them jobs with Economy, Travis Clark asked John and Laura Kelly if they would agree to allow Economy to take over Kelly Supply's employees; an offer which Kellys rejected.

55.     Following Kellys' rejection of Clark's proposal that Economy take over the employees of Kelly Supply, Economy began a pattern and practice of unilaterally and with little or no notice changing its policies and procedures toward Kelly Supply regarding placement and processing of customer orders, weighing and loading of trucks, testing of products mixed and/or loaded by Kelly Supply for Economy customers, invoicing, payments, customer communications, and even prohibited communications between employees of Kelly Supply and Economy who were working in the same building--all in order to cause Kelly Supply inordinate inconvenience and expense and undermine Kelly Supply's operations and performance under the parties' Service Agreement, as amended.

56.     During the Spring of 2012, Kelly Supply, on prior notice to and with the consent of Travis Clark, began hauling sand for well service companies operating in the Bakken area, using rolling stock and employees not necessary for Kelly Supply to continue fulfilling its mixing and delivery trucking responsibilities for Economy under the Service Agreement, as amended.

57.     Upon information and belief, in May, 2012, Sidney Investments was incorporated as a Delaware corporation, with its principal office and mailing address in Houston, Texas.

58.     Upon information and belief, on about June 7, 2012, Sidney Investments became qualified as a foreign corporation in Montana.

59.     On about June 11, 2012, Sidney Investments acquired a tract of land just outside Sidney

in Richland County, Montana (with an existing building thereon) from Roger and Donald Byer ("the Byer Parcel").

60.     On about June 26, 2012, Sidney Investments acquired a residence in Sidney, Richland County, from Harold and Jean Campbell ("the Campbell house").

61.     Upon information and belief, Sidney Investments began immediately improving the warehouse building on the Byer Parcel for mixing operations and well chemical monitoring ("ELIMS") facilities; thereafter expanding the building and constructing offices on the Parcel.

62.     Upon information and belief, on about July 1, 2012, Travis Clark and his wife Fern (also an employee of Economy) moved into the Campbell house as their Montana residence.

63.     On about July 7, 2012, Kelly Supply learned that a company other than Kelly Supply had been hired by Travis Clark for the trucking of Economy's products from Kelly Supply's facilities on the Property to a new Economy customer (Rock Pile) in the Bakken area; and Clark told John Kelly the other trucking company was retained by Economy at the customer's request.

64.     During the Summer of 2012, Economy, without prior notice to Kelly Supply, changed the oil used in some of the solutions mixed by Kelly Supply per Economy's formulas on the Property, causing chemical burns to Kelly Supply personnel.

65.     During the Summer of 2012, Economy, without prior notice to Kelly Supply, changed solid components in some of the solutions mixed by Kelly Supply per Economy's formulas on the Property, causing them to clog Kelly Supply's trailers and the mixing and loading equipment Economy had supplied.

66.     After the Summer of 2012, Economy switched, without notice to Kelly Supply, all delivery trucking of Economy's products to trucking companies (other than Kelly Supply),

leaving Kelly Supply with a large idle inventory of trucks and specialized trailers it had acquired specifically to handle Economy's customer deliveries in the Bakken area.

67.     Throughout 2012, Economy failed, despite repeated requests from Kelly Supply, to repair or replace faulty valves, gauges, pumps and other components on the unloading, mixing, loading and compacting equipment Economy had supplied to the Property, causing delays and inefficiency in Kelly Supply's performance of its obligations under the Service Agreement, as amended.

68.     On September 26, 2012, Travis Clark met with Kelly Supply personnel and represented to them that: (a) Economy was disconnecting the chemical mixers it had installed in the new Kelly Supply warehouse space and moving them to Williston, North Dakota for storage to make room for more Economy product on the Property; (b) Halliburton, a large Economy customer, had switched to a new system for its drilling chemicals, reducing demand for Economy's chemical products; (c) Economy had intended that the new mixer in the back of the Kelly Supply warehouse would be used for water-based solutions, but Economy did not get the bid; and (d) that the new facility constructed on the Byer Parcel was for Economy's ELIMS offices, and would have "absolutely nothing to do with mixing or anything we do out here."

69.     During the September 26, 2012 meeting, Clark represented that Economy intended to maintain its office on the Property; that Kelly Supply would always be Economy's exclusive guar mixing facility; that Kelly Supply would continue to load all of Economy's dry products for Halliburton; and that Kelly Supply would continue to be responsible for storage and loading of chemical totes and hazardous materials for Economy.

70.     Kelly Supply learned after the September 26, 2012 meeting that the chemical mixers had

14

not been transported to Williston, but had been transported to and installed in the building on the Byer Parcel, owned by Sidney Investments.

71.     During the Fall of 2012, Economy personnel on the Property attempted to provoke confrontations with Kelly Supply and to circumvent Kelly Supply management by giving instructions directly to Kelly Supply employees regarding inventory, storage, mixing and loading of Economy products on the Property.

72.     In the Fall of 2012, Kelly Supply was using its rolling stock that was not necessary for delivery of Economy's products to customers to haul sand and bentonite to Schlumberger and other drilling and well service companies in the Bakken area, pursuant to agreements between Kelly Supply and those companies.

73.     Upon information and belief, beginning in the Spring of 2012, Economy instructed its customers not to contact Kelly Supply regarding orders or delivery of Economy products; and beginning about October 1, 2012, Economy directed Kelly Supply to cease all communications with Economy customers, including Schlumberger, Halliburton and Pumpco which were also Kelly Supply direct customers.

74.     Before October 1, 2012, Kelly Supply had entered into Master Services Agreements, directly with Halliburton and Schlumberger, to deliver Economy's solutions and other products to Halliburton and Schlumberger at locations in the Bakken area.

75.     Upon information and belief, between September 26, 2012 and February 22, 2013, Economy's guar-based solutions and chemical additives were being mixed on the Byer Parcel by persons other than Kelly Supply and shipped directly to Economy's customers through trucking companies other than Kelly Supply.

76.    About January 5, 2013, Kelly Supply invoiced Economy for accrued rent on the office space Kelly Supply had constructed and Economy's personnel had occupied and used on the Property since December 1, 2011.

77.    On about January 15, 2013, Kelly Supply was notified by Economy that it would not pay Kelly Supply for use and occupancy of the office space on the Property, advised there was no enforceable agreement between Economy and Kelly Supply for lease of the office space, and advised Kelly Supply to take up any such commitment with Travis Clark.

78.    On about February 20, 2013, Economy ceased all mixing operations on the Property.

79.    On February 22, 2013, Economy's Bobby Hyatt notified Kelly Supply that Economy would be moving its offices and all mixing equipment and operations off the Property, starting that day.

80.    On about February 23, 2013, Economy vacated its office and lab space on the Property.

81.    Upon information and belief, from and after February 23, 2013, all of the transloading, guar-based solutions and chemical additive mixing activities, and customer delivery activities that had been conducted by Kelly Supply for Economy under the Service Agreement, as amended, were conducted on and from the Byer Parcel owned by Sidney Investments; and the Economy personnel who had occupied offices and lab space on Kelly Supply's Property moved their offices to the Byer Parcel.

82.    On about February 26, 2013, Economy's Bobby Hyatt came onto the Kelly Supply Property, attempted to remove the truck scale, and then rendered the scale unusable by cutting the wiring to the scale's load cells.

83.    Beginning on about February 23, 2013, persons acting for or at the direction of Economy

removed from the Property the gel mixers, tanks and other Economy equipment.

84.    On about March 5, 2013, persons acting for or at the direction of Economy physically removed all wire and conduit that had been installed to supply power for the mixers and tanks Economy had installed on the Property in 2010 and 2011, depositing the removed wire and conduit into a dumpster, and causing damage to the siding and insulation on Kelly Supply's warehouse building in the course of removal.

85.    On about March 8, 2013, Economy advised Kelly Supply that Economy would be picking up Economy's products stored in the new warehouse on the Property, and Kelly Supply moved a portion of such products to the flatbed loading area on the Property for pickup; but Economy did not dispatch anyone to load out the products.

86.    At about 11:30 p.m. on March 11, 2013, Kelly Supply's staff accountant witnessed from a short distance outside the building flames and smoke pouring from an area of the warehouse on the Property (separate from the area leased by Economy) that Kelly Supply had rented as shop space to a well equipment company, and immediately reported a fire in progress to emergency service providers.

87.    Despite the efforts of Richland County area fire personnel who fought the blaze through the night, a substantial part of the warehouse, including Kelly Supply's offices and the office and lab Economy had vacated three weeks prior, were destroyed by a fire that originated in the rented shop area.

88.    The Economy products it had ordered for pickup before the fire were destroyed, but the new area of the warehouse, and the area in which Economy's other products were stored, were not destroyed and remained usable after the fire.

17

89.     On about March 13, 2013, persons working for or on behalf of Economy returned to the Property and physically removed from areas of the Kelly Supply warehouse not still closed off for fire investigation all additional electrical components, including breaker boxes and three phase reducer, that had been installed to service the mixers and tanks in and adjacent to the warehouse.

90.     On about March 15, 2013, persons working for or on behalf of Economy removed all of the approximately 150 feet of underground service wiring between the Kelly Supply warehouse building and the local electric cooperative's transformer that had been installed in the Fall of 2010.

91.     Upon information and belief, sometime after January 1, 2013, Economy caused Schlumberger and Pumpco to cease submitting orders to Kelly Supply for purchase and/or delivery of sand or other supplies in the Bakken area.

92.     Upon information and belief, sometime after February 1, 2013, Economy caused Halliburton to cease using Kelly Supply to deliver Economy products to Halliburton in the Bakken area.

93.     Notwithstanding Economy's products have remained in the Kelly Supply warehouse on the Property since the March 11, 2013 fire, Economy has failed and refused to pay warehouse rent to Kelly Supply for any period since April 1, 2013.

94.     By letter dated June 18, 2013, Economy notified Kelly Supply that its Service Agreement was terminated due to Kelly Supply's inability to perform after the fire.

95.     Since February, 2013, Kelly Supply has continued to conduct business operations on and from the Property, and remained ready, willing and able to fulfill its obligations under the

Service Agreement, as amended, *but for* Economy's unilateral termination of Kelly Supply's trucking to Economy's customers, diversion of all transloading and mixing operations to the Byers Parcel owned by Sidney Investments, and removal of all transloading and mixing equipment, tanks and electrical service from the Property--all before the March 11, 2013 fire.

## COUNT 1:   BREACH/REPUDIATION OF CONTRACT

96.   Kelly Supply incorporates all paragraphs above as if fully set forth herein.

97.   On about May 14, 2010, Economy and Kelly Supply entered into a three year contract for lease of warehouse space, loading dock and concrete apron on the Property; and to employ Kelly Supply to unload Economy's products, mix components supplied by Economy with equipment supplied by Economy into guar-based solutions and liquid slurries pursuant to formulas provided by Economy, and load the Economy products for delivery to Economy's customers in the Bakken area.

98.   The Economy/Kelly Supply contract was further refined and memorialized in the parties' Service Agreement for a base term of three years, dated effective August 1, 2010, subject to year to year extension; and was thereafter modified and amended orally and by the parties' course of conduct to include: expansion of the leased warehouse space by 10,000 square feet; addition of chemical additives to Kelly Supply's mixing obligations; addition of trucking by Kelly Supply of Economy's products to its Bakken area customers for agreed per-hour transportation and demurrage rates; installation of the truck scale; and Economy's use and occupancy of newly constructed laboratory and office space on the Property.

99.   The Service Agreement was extended in writing until August, 2016.

100.   Kelly Supply fulfilled all duties, obligations and conditions required to be performed by

Kelly Supply in accordance with the terms and conditions of its contract with Economy, as modified, amended, and extended.

101.    Economy breached and/or repudiated the contract between Economy and Kelly Supply by, without limitation: its failure and refusal to provide in working condition, prior to 2012, the equipment it agreed to provide to the Property for Kelly Supply's transloading and mixing operations; unilateral termination beginning about September 1, 2012 of Kelly Supply's right to provide trucking of Economy's products to its Bakken area customers; diversion beginning in about mid-2012 of all of Economy's guar-based solutions and chemical additives mixing from Kelly Supply to Sidney Investments and/or the Byer Parcel owned by Sidney Investments; removal of all transloading, mixing and loading equipment from the Kelly Supply Property prior to March 1, 2013; removal of the wiring on about March 5, 2013 necessary to transmit power for operating such transloading, mixing and loading equipment; and failure and refusal to compensate Kelly Supply for Economy's use and occupancy of lab space and office space on the Property from about December 1, 2011 through February, 2013.

102.    Kelly Supply has been injured by Economy's breaches and repudiation of the parties' contract, and incurred damages to be proven at trial, believed to be in excess of $5,000,000.00.

**COUNT 2: BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING**

103.    Kelly Supply incorporates all paragraphs above as if fully set forth herein.

104.    By virtue of Economy and Kelly Supply teaming together and entering into a contract for Kelly Supply to transload, mix, and deliver Economy's products to its Bakken area customers pursuant to orders received and processed by Economy and proprietary formulas provided by Economy, with equipment placed or installed on Kelly Supply's Property by and at the direction

of Economy, a special relationship arose between Economy and Kelly Supply.

105.    Economy was not during the period April 2010 through February, 2013, qualified to do

business as a foreign corporation in Montana, and for all intents and purposes used Kelly Supply

as Economy's captive agent in Montana for transloading, storage, mixing and delivery of

Economy's products to and for Economy's customers in the Bakken area.

106.    Economy occupied a superior and dominant position in the relationship, as a multi-billion

dollar company with superior resources and bargaining position over Kelly Supply, a small

family owned oil field supply company, in part because Economy controlled and dictated all

terms and conditions for fulfillment of all customer orders, and controlled all collection and

disbursements in connection with all such orders; because Economy substantially dominated the

supply of guar-based solutions essential for "fracking" in the Bakken area; and in part because

Economy owned and controlled the equipment necessary for Kelly Supply's fulfillment of its

service obligations under the parties' contract.

107.    Implied in the parties' contract under Montana law is a covenant of good faith and fair

dealing, including an obligation of honesty in fact.

108.    Economy's duties are measured by applicable business and industry standards, practices

and duties established under Montana law in relation to oilfield supply contracts.

109.    Economy gained a special and unique advantage over Kelly Supply, using its role as

seller and supplier of guar-based solutions and chemical additives to the Bakken area and its

financial superiority to virtually take over Kelly Supply's business and Property and cause Kelly

Supply to expend hundreds of thousands of dollars for expansion of its facilities and rolling stock

in reliance on the parties' contract, while simultaneously proceeding secretly to jerk the entire

contracted storage, services and trucking from Kelly Supply to cause Kelly Supply severe

financial distress and render it unable to continue in the oilfield supply industry.

110.   Economy's scheme, perpetrated on Kelly Supply from about April, 2010 through March,

2013, is contrary to reasonable commercial standards of fair dealing in trade and well outside of

accepted commercial practices.

111.   Economy's misrepresentations, nonpayment, intentional and systematic diversion of all

rights and obligations of Kelly Supply under the parties' contract, and failure to observe

reasonable commercial standards of honesty in fact and fair dealing have deprived Kelly Supply

of the full benefit of its contract with Economy and/or of Kelly Supply's Property and work

performed in the Bakken area from which Economy substantially benefited.

112.   Economy's conduct constitutes a willful and material violation of the covenant of good

faith and fair dealing implied in its contract with Kelly Supply, as amended and extended.

113.   Kelly Supply has been injured by Economy's conduct and incurred damages for which

Kelly Supply is entitled to be compensated in amounts to be determined at trial.

114.   Economy's conduct toward Kelly Supply was made and done with malice, express or

implied, justifying the award to Kelly Supply of punitive damages in an amount to be determined

by the trier of fact as sufficient to punish such conduct and deter Economy from repeating the

same.

### COUNT 3:   INTENTIONAL INTERFERENCE BY ECONOMY WITH KELLY SUPPLY THIRD-PARTY CONTRACTS AND PROSPECTIVE BUSINESS ADVANTAGE

115.   Kelly Supply incorporates all paragraphs above as if fully set forth herein.

116.   Beginning in the Fall of 2012 and continuing into Winter 2013, Kelly Supply entered into

direct agreements with drilling and well service companies, including without limitation, Halliburton, Pumpco and Schlumberger, to provide sand, bentonite and/or trucking services in the Bakken area with facilities, equipment and employees that belonged to Kelly Supply and were not committed or necessary to Kelly Supply's continued performance of its obligations under its contract with Economy.

117.    Economy had knowledge of Kelly Supply's direct agreements and customer relationships with Halliburton, Schlumberger, Pumpco and other Bakken area operators, and Kelly Supply's anticipated income and prospective business benefits from such agreements and relationships.

118.    Economy, using its financial superiority and substantial control of the market for guar-based solutions and chemical additives in the Bakken area, caused Halliburton, Schlumberger, Pumpco and other drilling and well service companies to materially scale back or terminate altogether their orders to Kelly Supply for sand, bentonite, trucking and other supplies and services in the Bakken area.

119.    By its statements and actions, Economy interfered with Kelly Supply's agreements and prospective business advantage with Halliburton, Pumpco, Schlumberger, and other drilling and well service companies.

120.    Economy by such interference has caused Kelly Supply material injury and damages for which Kelly Supply is entitled to be compensated in an amount to be determined at trial.

### COUNT 4:   INTENTIONAL INTERFERENCE WITH CONTRACT BY SIDNEY INVESTMENTS AND FOR ACCOUNTING

121.    Kelly Supply incorporates all paragraphs above as if fully set forth herein.

122.    Defendant Sidney Investments, when formed in May, 2012 and when qualified to conduct business in Montana in June, 2012, had knowledge of the terms and provisions of the contract

between Economy and Kelly Supply, as amended; and knew or should have known that the contract provided not only for Economy's lease of part of the Property from Kelly Supply, but also for Kelly Supply's conducting of transloading and mixing services on the Property for Economy.

123.   Sidney Investments knew, when it qualified to conduct business in Montana, that the contract between Economy and Kelly Supply for warehouse space, transloading, mixing and other services had been extended until at least August, 2016.

124.   Sidney Investments knew, when it qualified to conduct business in Montana, that Kelly Supply had expended millions of dollars on facilities expansions and improvements and equipment acquisitions in reliance on its long term contract with Economy.

125.   Sidney Investments acquired and began improvements of and on the Byers Parcel in 2012 with the intention entirely supplanting Kelly Supply in providing warehouse, transloading, mixing, office and laboratory space and services to and for Economy in the Bakken area.

126.   Beginning in the Summer of 2012, Sidney Investments caused or facilitated Economy's diversion of all of its product transloading, guar-based solutions and chemical mixing operations, trucking delivery and warehousing functions from Kelly Supply and the Property to Sidney Investments and the Byers Parcel.

127.   By its actions, Sidney Investments directly interfered with the contract between Kelly Supply and Economy, and Kelly Supply's prospective business advantage in dealings with Economy, causing Kelly Supply injury for which it is entitled to be compensated in damages in an amount to be determined at trial.

128.   Upon information and belief, Sidney Investments has since about June 12, 2012, received

rents, income and profits from Economy and/or customers of Economy in the Bakken area that would have been received by Kelly Supply *but for* the interference of Sidney Investments in the contract between Economy and Kelly Supply.

129. Kelly Supply is entitled to an accounting of all rents, income and profits received by Sidney Investments from Economy and/or Economy's Bakken area customers arising from or related to transloading, guar-based solutions and chemical mixing operations, trucking delivery and warehousing functions that would otherwise have been provided by Kelly Supply.

## COUNT 5: FRAUD/MISREPRESENTATION BY ECONOMY AND CLARK

130. Kelly Supply incorporates all paragraphs above as if fully set forth herein.

131. Beginning in March, 2010, and continuing through September, 2012, Economy, through Lawrence Walton, Matthew White, Bobby Hyatt and Travis Clark, made representations to Kelly Supply, express and implied, that Kelly Supply was and would continue to be, at least until August, 2016, Economy's exclusive contractor in the Bakken area for the unloading, storage, mixing and delivery of Economy's guar-based solutions and chemical additives pursuant to orders from Economy's oilfield customers and would be fairly compensated for Kelly Supply's services for the mutual benefit of Economy and Kelly Supply.

132. Economy and its representatives made such representations with the intent that Kelly Supply would rely on them, and provided supplies, formulas, equipment and payments to Kelly Supply to promote its continuing reliance.

133. Kelly Supply reasonably relied on such representations, continuing to provide the use of its Property, materially expanding its warehouse, office and loading facilities, increasing its fleet of trucks and trailers, and increasing its labor force to provide a location and perform services in

25

the Bakken area which Economy then had no capability to provide or perform; while Kelly Supply was meanwhile foregoing other opportunities to provide oil field supplies and services in the Bakken area.

134. The representations of Economy and its representatives were made with the intent that Kelly Supply would rely on them and continue to provide unloading, storage, mixing, transloading and delivery services to or for Economy's benefit until Economy could establish warehouse, laboratory, office, mixing and transloading space, and other capabilities for mixing and delivery for and to its customers in the Bakken area so that Economy no longer needed Kelly Supply and would not have to compensate Kelly Supply.

135. The misrepresentations of Economy and its representatives are material to Kelly Supply's ability to benefit from the Service Agreement, as amended and extended, and its team efforts because Kelly Supply's principal consideration in the contract is the compensation for transloading, mixing and delivery services in connection with the customer orders.

136. Kelly Supply was ignorant of the falsity of the representations regarding Economy's intent to continue using Kelly Supply as its exclusive contractor for transloading, mixing and product delivery services in the Bakken area.

137. Economy and its representatives continued to make misrepresentations to lure Kelly Supply into continuing to provide services and perform under the contract while, all along, Economy never intended to live up to their representations.

138. In the Fall of 2011, on about February 2, 2012 and on about September 26, 2012, Travis Clark made representations to Kelly Supply, express and implied, not only about Economy's intentions to continue using Kelly Supply as Economy's exclusive contractor for mixing and

26

transloading services in the Bakken area, but also about Economy's intention to continue using

Kelly Supply for delivery of Economy's products to those Economy customers—to wit:

Schlumberger, Halliburton, and Pumpco—to whom Kelly Supply had previously delivered such

products on Economy's behalf, and to fairly compensate Kelly Supply for the use and occupancy

by Clark and other Economy personnel of the office and laboratory space on the Property from

about December 1, 2011.

139.    Such Travis Clark representations, to the extent not made or communicated with the

authorization of Economy, were made or done by Clark, personally, with reckless disregard for

the truth or falsity thereof, with the intent Kelly Supply would rely on them to its detriment.

140.    Kelly Supply reasonably relied on Clark's misrepresentations about continuing Kelly

Supply's trucking services in materially expanding its fleet of trucks and trailers in about late

2011 to meet Schlumberger's demand, and continuing to hire and train drivers to operate Kelly

Supply's expanded truck fleet.

141.    Kelly Supply reasonably relied on Clark's misrepresentations about Economy fairly

compensating Kelly for use and occupancy of office and lab space on the Property by finishing

such space for Economy's use and continuing to permit such use from December, 2011 through

February 22, 2013.

142.    Kelly Supply reasonably relied on Clark's misrepresentations in February, 2012

about Economy's intent to continue using Kelly Supply as its exclusive mixer of guar-based

solutions in the Bakken area by discontinuing negotiations with third parties regarding potential

sale of its Property and assets.

143.    As the proximate result of Kelly Supply's reliance on the misrepresentations of Economy

and Travis Clark personally, Kelly Supply has been injured and suffered substantial damages in amounts to be determined at trial.

144.    The misrepresentations of Economy were made and communicated to Kelly Supply with knowledge of the falsity thereof, or reckless disregard for the truth or falsity thereof, justifying the award to Kelly Supply of punitive damages in an amount to be determined by the trier of fact as sufficient to punish such conduct and deter Economy from repeating the same conduct in the future.

145.    The misrepresentations of Travis Clark, personally, were made and communicated to Kelly Supply with knowledge of the falsity thereof, or reckless disregard for the truth or falsity thereof, justifying the award to Kelly Supply of punitive damages in an amount to be determined by the trier of fact as sufficient to punish such conduct and deter Clark from repeating the same conduct in the future.

### COUNT 6:    UNJUST ENRICHMENT

146.    Kelly Supply incorporates all paragraphs above as if fully set forth herein.

147.    Beginning about May 1, 2010, Kelly Supply conferred benefits on Economy and Clark by providing them with business and profits in the Bakken area based on the use and occupancy of Kelly Supply's Property, equipment, labor and reputation in the area that was created, developed, and maintained by Kelly Supply for the benefit of Kelly Supply and Defendants Economy and Clark.

148.    Defendants Economy and Clark have wrongfully retained those benefits without providing Kelly Supply with just compensation.

149.    Defendants Economy and Clark accepted and retained the benefits conferred upon them

by Kelly Supply under circumstances that would make such acceptance and retention unjust without Defendants Economy and Clark being required to pay the full value of the benefits.

**PRAYER FOR RELIEF**

WHEREFORE, Kelly Supply respectfully prays for the following relief:

A.     On Count 1, granting judgment in favor of Kelly Supply and against Economy, for damages for breach of the parties' 2010 contract in an amount to be proven at trial but believed to be not less than $5,000,000.00, together with pre-judgment interest;

B.     On Count 2, granting judgment for Kelly Supply and against Economy for actual and compensatory damages;

C.     On Count 3, granting judgment for Kelly Supply and against Economy for all actual, compensatory and consequential damages proximately caused Kelly Supply by Economy's intentional interference with Kelly Supply's contracts and prospective business advantage in providing oilfield supplies and services to Schlumberger, Halliburton, and Pumpco;

D.     On Count 4, granting judgment for Kelly Supply and against Defendant Sidney Investments for all actual, compensatory and consequential damages proximately caused Kelly Supply by Sidney Investments' intentional interference with Kelly Supply's contract with Economy, and for accounting by Sidney Investments;

E.     On Count 5, granting judgment for Kelly Supply and against Defendants Economy and Travis Clark, jointly and severally, for all actual, compensatory and consequential damages proximately caused Kelly Supply by said Defendants' misrepresentations after November 1, 2011;

F.     On Count 6, granting judgment for Kelly Supply and against Defendants

Economy and Clark, jointly and severally, for the full reasonable value of all labor, equipment usage, Property usage, supplies, and services directly or indirectly furnished by Kelly Supply to or for the benefit of said Defendants, or either of them, in connection with Clark's office on the Property from and after December 1, 2011 and/or Economy's sale or delivery of its products to oilfield customers in the Bakken area from and after May 10, 2010;

G.     On all Counts, for post-judgment interest at the highest legal rate from the date of entry of judgment until the judgment is fully satisfied, and costs;

H.     On Counts 2, 3 and 5, for punitive damages as against Defendant Economy;

I.     On Count 4, for punitive damages as against Defendant Sidney Investments;

J.     On Count 5, for punitive damages as against Defendant Travis Clark; and

K.     For such other and further relief as the Court deems just and proper.

## JURY DEMAND

Pursuant to Rule 38, M.R.Civ.P., Plaintiff Kelly Supply hereby demands a trial by jury of the issues triable by right by jury.

DATED this 29th day of October, 2013.

EDWARDS, FRICKLE & CULVER

Triel Culver
Attorneys for Plaintiff Kelly Supply, LLC

30